# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# OWENSBORO DIVISION

CIVIL ACTION NO. 4:11CV-118-JHM

JAMES COLE                                                                           PLAINTIFF

VS.

MANAGEMENT & TRAINING
CORPORATION                                                        DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Management & Training Corporation's Motion for Summary Judgment [DN 30]. Fully briefed, this matter is ripe for decision.

## I. BACKGROUND

This case arises from the termination of Plaintiff James Cole's employment at the Earle C. Clements Center ("Earle C.") on October 21, 2010. During his tenure at Earle C., Cole served in various capacities, but he concluded his employment with the center as the Deputy Director. Earle C., a facility located in Morganfield, Kentucky, operates under the Department of Labor's (DOL) national Job Corps program, which assists young, low-income individuals in obtaining a high school education as well as assisting them in finding a job. Although the DOL administers the program, it contracts with private corporations to actually operate the facility. In 2008 the DOL contracted with Management & Training Corporation ("MTC") to take-over operations of the facility. MTC retained the previous Center Director, Billy Cooper, and based on Cooper's recommendation, hired Cole as the Deputy Center Director. In addition to making Cole the Deputy Director, MTC put him in its executive development program, which provides training to those individuals that the company believes could serve as a future director of a facility.

Due to the poor performance of Earle C. at the time MTC took control of the facility in 2008 and the continued low ranking in 2009, MTC sent Carol Savage, Director of Performance, to Earle C. in order to provide technical assistance and to offer suggestions for improving the center. Starting in August of 2009, Savage began her periodic visits to Earle C., but she continued to have her main office in Utah. In addition to Savage, MTC sent Regional Operating Directors ("RODs"), Kathryn Lea and Connie Brewer, to assist in the improvement of the facility.

### A. Alleged Incidents of Harassment and Reports of Harassment

According to Cole, the harassment by Savage started in September of 2009 when she saw a photo of his family in his office. Cole, an African American, is married to a Caucasian woman and they have two children together. After looking at the photo, Savage allegedly commented that she could see he had "a thing for white women" and that "she understood why there were so many women in management positions there, and she made accusations that maybe they or [Cole] had jungle fever or something." (Cole Depo., DN 30-2, at 8). In addition to harassment by Savage, Cooper stated that he heard Lea and Brewer accuse Cole of promoting white females at Earle C. in order to obtain sexual favors. (Cooper Depo., DN 33-2, at 17). Cooper also specifically heard Lea refer to Cole as a "dog." Id. at 18.

Following these incidents of harassment by Savage, Lea, and Brewer, Cole reported the comments to Director Cooper. In addition, Cole, at Cooper's direction, filed a complaint with Teresa Hagedorn, the Earle C. Center Human Resources Manager. Hagedorn remembers Cole making a formal complaint to her regarding the harassment and she stated she would normally have sent the complaint on to either Kay Johnson or Jody Trujillo at the corporate HR offices.

2

However, Defendant neither has a copy of any complaint filed by Hagedorn nor does Johnson have any recollection of receiving a formal complaint.

The accusations as to Cole's alleged affairs with staff led to an investigation by Kay Johnson, MTC's Corporate Human Resources Manager, in December of 2009. At the conclusion of her investigation, Johnson did not recommend any type of disciplinary action against Cole. Approximately a month following the investigation, Cooper recommended merit-based salary increases for several employees, including Cole. However, Cole was denied an increase. According to Cooper, Cole was the only employee who was denied an increase in salary. In January of 2010, when Cole asked Johnson why he did not receive a merit increase, Johnson reportedly responded, "white women around here." (Cole Depo., DN 33-1, at 28-29). Cole understood Johnson's comment to be in reference to her previous investigation into Cole's alleged affairs with female staff. On the other hand, when Cooper inquired about Cole's merit increase, Johnson told Cooper that Cole actually received more in compensation than what the company originally intended him to make as Deputy Director, and as a result, Johnson stated that she would not approve a raise for him. (Cooper Depo., DN 33-2, at 29-30).

A third alleged incident of harassment occurred in March 2010 when Cole attended a meeting with Lea and Savage. Although both Lea and Savage were in the room when Cole entered, Savage said that she would leave Lea to handle the meeting. Shortly after Savage left the room, Cole stated that the following interaction occurred:

> So Kathryn Lea sits down across from me, and she grabs my arm, and she's, like, caressing my arm and wanted me and started asking me questions about sleeping with Jillian Russelburg. This is in March of 2010. This has been going on since -- a year, since MTC had been there.
> And she wanted me to discuss it. She said, "I know you're having an affair." Kathryn Lea, "I know you're having an affair with Jillian Russelburg. You can be honest with me and tell me about it," and this, that, and the other. . . .

> So she's rubbing my arm, she's got her boobs -- she always wore crazy shirts, she's got her boobs all out on the table, and she's rubbing my arm, and I made a comment to her. I said, "Kathryn, are you going to talk to me about business, or is this the conversation you wanted to talk about?"
> And she said, "I just want you to answer honestly," like that.
> And I said, "I don't have anything to do with Jillian Russelburg, and stop touching me, and if you're not going to talk to me about business I'm gone."
> She said, "Well, I know you're lying."
> And I said, "Well, how do you know I'm lying, Kathryn?
> She said, "Because you looked away."

(Cole Depo., DN 33-1, 24-25). Shortly after this interaction with Lea, Cole said that he interrupted a meeting to report the incident to Cooper and Lonnie Hall, the Southeast Region Director. Cooper also contacted Hall concerning the harassment of Cole, and he remembered Hall saying that he would handle this situation. However, when asked about the reports from Cole and Cooper, Hall stated that he did not remember Cole making any complaints about sexual or racial harassment. In fact, Hall stated that he only "vaguely" remembered receiving a complaint from Cole regarding Savage's "audit being tough and interrupting either the classes or something to that effect." (Hall Depo., DN 30-6, at 4-5).

### B. Request to Violate the Law

In addition to incidents of harassment, Cole alleges that Lonnie Hall requested that both Cole and Cooper violate the Department of Labor's Zero Tolerance Policy. This meeting took place just prior to Cole's graduation from the Executive Development Program. Also present in the meeting at that time was Derrick Dulfin, Earle C. Center's overseeing officer from the Department of Labor. Specifically, according to Cooper, "Hall requested that students who were caught with small amounts of marijuana not be prosecuted under the Center's Zero Tolerance policy, and that they not be separated from Job Corps program." (Cooper Depo., DN 33-2, at 11). Both Cole and Cooper refused Hall's request to not enforce the Department's Zero Tolerance Policy.

### C. Cole's Termination from MTC

An investigation into Earle C. occurred following a complaint made to the Department of Labor by a student of unfair separation from the facility. Dulfin reported the incident to John Pedersen, MTC's Vice President of Operations. As a result, MTC created an investigation team consisting of Carol Savage, Connie Brewer, Kathryn Lea, Lonnie Hall, and Kay Johnson to investigate the allegations. At the conclusion of the investigation, the team made several personnel recommendations, including that MTC terminate both Cooper and Cole immediately for "[j]udgment about reporting affair" and "[p]oor management." (Summ. Of Investigation Report 10-7-10, DN 30-14, at 8). The final decision to terminate Cole was made by Pedersen, Hall, and Teresa Aramaki, Vice President of Human Resources.

On October 21, 2010, MTC terminated Cole after giving him the option to resign from employment with MTC. Defendant provided Cole with a "Notice of Caution" that listed the reasons for terminating him. The Notice, a collection of information gathered during an investigation concluded on October 7, 2010, listed three specific violations of MTC policy: (1) "Careless and inefficient performance of duties," (2) "Violation of any company or facility rules, policies, the employee handbook, or federal, state or local laws," and (3) "Involvement in a criminal act or negative behavior that presents a detrimental image of the company or presents a concern for the well-being or reputation or employees, the customer, or program participants." (Notice of Caution, DN 33-9, at 2).

## II. SUMMARY JUDGMENT

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the

basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252. It is against this standard the Court reviews the following facts.

### III. DISCUSSION

Plaintiff alleges four claims against Defendant MTC: (1) a hostile work environment claim based on race and sex discrimination, (2) an unlawful termination claim for refusing to violate the law, (3) a retaliation claim for reporting sex and race discrimination, and (4) an action based on intentional infliction of emotional distress. However, Plaintiff conceded that he does not have a claim for intentional infliction of emotional distress in his responsive motion. (Resp. to Def.'s Mot. for Summ. J., DN 33, at 1). Therefore, the Court will not address this issue any further. Defendant refutes liability for the three remaining claims.

### A. Sex/Race Hostile Work Environment Claim

Plaintiff alleges Defendant violated both Title VII and the Kentucky Civil Rights Act. Under the Kentucky Civil Rights Act ("KCRA"), it is unlawful for an employer

> [t]o fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, national origin, sex[.]

K.R.S. § 344.040(1)(a). "Racial discrimination claims filed pursuant to Ky.Rev.Stat. § 344.040(1) are analyzed under the standards applied to federal racial discrimination claims brought pursuant to Title VII of the Civil Rights Act of 1964." Scott v. G & J Pepsi–Cola Bottlers, Inc., 391 Fed. Appx. 475, 477 (6th Cir. 2010). Similarly, a sexual harassment claim brought under KCRA is to be analyzed in the same manner as a claim brought under Title VII. Ammerman v. Board of Educ. of Nicholas Cnty., 30 S.W.3d 793, 797–98 (Ky. 2000).

In order for racial harassment to be actionable under Title VII, "it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (citation omitted). The same applies for sexual harassment claims. See, e.g., Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 754 (1998) ("For any sexual harassment preceding the employment decision to be actionable, however, the conduct must be severe or pervasive."). To establish a prima facie case of hostile work environment based on race, a plaintiff must prove that: "1) He was a member of a protected class; 2) He was subjected to unwelcome racial . . . harassment; 3) The harassment was based on race . . . ; 4) The harassment had the effect of unreasonably interfering with [plaintiff's] work performance by creating an intimidating, hostile, or offensive work environment; and 5) The existence of employer liability." Hafford v. Seidner, 183 F.3d 506, 512 (6th Cir. 1999). In the case of sexual harassment, a plaintiff must show almost the

exact same elements as those required for showing a hostile work environment based on race, except that a plaintiff must establish that the harassment was based on sex.[1] See Clark v. United Parcel Service, Inc., 400 F.3d 341, 347 (6th Cir. 2005).

For the purposes of Defendant's motion for summary judgment, the Court will assume that the first three requirements are met since Defendant does not appear to dispute those elements. Both parties focus on whether the actions by Savage, Lea, and Brewer rose to the level of "hostile," the fourth prong. In determining whether an environment is "hostile" or "abusive," the Court must look at the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993). The standard, as articulated by the Sixth Circuit, for hostile is as follows:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive-is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

Williams v. General Motors, 187 F.3d 553, 566 (6th Cir. 1999) (citing Harris, 510 U.S. at 21-22). "[S]imple teasing, . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Barrett v. Whirlpool Corp., 556 F.3d 502, 515 (6th Cir. 2009) (citation omitted). The fourth prong, the

---

[1] For a sexual harassment claim, a plaintiff must demonstrate: "(1) she is a member of a protected class, (2) she was subjected to unwelcome sexual harassment, (3) the harassment was based on her sex, (4) the harassment created a hostile work environment, and that (5) the employer is vicariously liable." Clark v. United Postal Service, Inc., 400 F.3d 341, 347 (6th Cir. 2005) (quoting Williams v. Gen. Motors Corp., 187 F.3d 553, 560-61 (6th Cir. 1999)).

combination of a subjective and objective component, is analyzed based on a totality of circumstances. Id.

Under these facts, there seems to be little doubt that Plaintiff considered the comments made by Brewer, Lea, and Savage to be subjectively severe or pervasive as demonstrated by his complaints concerning the behavior of those individuals. However, the comments and actions must also be considered objectively severe or pervasive. As for severity of the alleged incidents, Plaintiff argues that each situation he encountered with Brewer, Lea, and Savage would suffice to meet the objectively severe element. Starting with the comment concerning "jungle fever," this appears to be an isolated incident that involved only Savage. In a case out of the Northern District of Texas involving supervisor harassment of individuals in an interracial relationship, the court concluded that "[a] reasonable jury could not find . . . that the references to 'jungle fever' were sufficiently severe and pervasive that they altered a term or condition of plaintiffs' employment. Wooten v. Fed. Express Corp., 2007 U.S. Dist. LEXIS 2195, *73 (N.D. Tex. Jan. 9, 2007).[2] However, on appeal, the Fifth Circuit noted that the outcome as to the racial harassment claim may have been different if the plaintiffs had put the employer immediately on notice following the comments. Specifically, the court noted that "in context, especially when [plaintiff] reports that he asked [the supervisor] to stop, a reasonable juror could see it as more than mere teasing; it can be understood to express a core of virulent and longstanding disapproval of interracial romantic relationships." Wooten v. Fed. Express Corp., 325 Fed.Appx. 297, 302 (5th Cir. 2009). In this instance, the alleged statement concerning "jungle fever" is undoubtedly racist and "certainly insensitive, ignorant, and bigoted." Williams v. CSX Transp. Co., Inc., 643 F.3d 502, 513 (6th Cir. 2011) (quoting Harris, 510 U.S. at 23). However, the Sixth

---

[2] In Wooten the supervisor made references to one of the plaintiffs having "jungle fever" approximately ten or eleven times. Id.

Circuit has held that one racial slur by a coworker does not make meet the objectively severe requirement for a hostile work environment.  Diamond v. U.S. Postal Service, 29 Fed.Appx. 207, 211 (6th Cir. 2002) (citing Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268 (2001)) ("But, as the Supreme Court has recently held, normally a single remark, where it represents an 'isolated incident,' is unable to produce so severe an effect.").  As a result, the single incident alleged by Plaintiff is insufficient to rise to the level of severity to demonstrate a hostile work environment.

In addition to racial hostility, Cole alleges that Lea, Brewer, and Savage engaged in sexual harassment by constantly accusing Plaintiff of having affairs with women who worked at Earle C.  Although Cole alleged that this happened many times, he only describes one specific incident, other than the one previously discussed involving Savage, that involved an accusation along with inappropriate physical contact.  Plaintiff describes an incident that occurred with Lea on March 2010 where Lea tried to get Cole to admit to having an affair with another employee, and in the process, Lea allegedly rubbed his arm in a way that made him feel uncomfortable.  While this may constitute inappropriate behavior for the office, "Title VII was not meant to create a 'general civility code,' and the 'sporadic use of abusive language, gender-related jokes, and occasional teasing' are not sufficient to establish liability."  Clark v. United Parcel Service, Inc., 400 F.3d 341, 352 (6th Cir. 2005) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)).  At the same time, summary judgment should be denied in instances where a plaintiff's "allegations, taken as a whole, raise a question whether [a plaintiff] was subjected to more than 'genuine but innocuous differences in the ways men and women routinely interact[.]'" Williams v. General Motors Corp., 187 F.3d 553, 564 (6th Cir. 1999) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 75 (1998)).

The Plaintiff fails to identify any case that would suggest this Lea's behavior would be considered severe enough to create a hostile work environment. In contrast, Defendant identifies several cases in which courts granted summary judgment for the employer where much more offensive instances of sexual harassment were alleged to have taken place. However, the Court finds more compelling the facts of Burnett v. Tyco Corp., 203 F.3d 980, 981 (6th Cir. 2000), which involved three separate incidents of sexual harassment over the course of six months. The most egregious incident occurred at a meeting in which the personnel manager "allegedly placed a pack of cigarettes containing a lighter inside [plaintiff's] tank top and brassiere strap." Id. Even though the incident involved an "element of physical invasion" and "perhaps even constitute[d] a battery," the court concluded that "a single battery coupled with two merely offensive remarks over a six-month period does not create an issue of material fact as to whether the conduct alleged was sufficiently severe to create a hostile work environment." Id. at 984-85 (citation and internal quotation marks omitted). Undoubtedly, Lea's alleged rubbing of Plaintiff's arm and accusing him of an affair crossed the threshold into subjectively unwelcome contact; however, the Court cannot conclude that the interaction sufficiently rises to the level of an objectively severe environment that would allow a question to be presented to a jury.

Finally, the Court must also consider the pervasiveness of the harassment experienced by Cole under the totality of circumstances. Regarding the importance of viewing all the individual events as a whole, the Sixth Circuit noted as follows:

> [T]he totality-of-circumstances test must be construed to mean that even where individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation. This totality-of-circumstances examination should be viewed as the most basic tenet of the hostile-work-environment cause of action. Hence, courts must be mindful of the need to review the work environment as a whole, rather than focusing single-mindedly on individual acts of alleged hostility.

Williams v. General Motors Corp., 187 F.3d 553, 563 (6th Cir. 1999). In fact, the Sixth Circuit reversed the district court in Williams after it "divided and categorized the reported incidents, divorcing them from context and depriving them of their full force." Id. at 562. In Williams the plaintiff recounted fifteen specific incidents of harassment over the course of a year. Williams, 187 F.3d at 559.

In this case, Plaintiff describes the harassment by Lea, Brewer, and Savage as "repetitive and continuous," starting with Savage's comment in September of 2009 and ending, presumably, when Defendant terminated his employment in October of 2010. Even though Plaintiff describes the situations as numerous, he only actually describes four incidents of harassment during that time period.[3] The fact that Plaintiff fails to describe additional incidents does not necessarily preclude his ability to defeat summary judgment. Abeita v. TransAmerica Mailings, Inc., 159 F.3d 246, 252 (6th Cir. 1998) ("Plaintiff's inability to recount any more specific instances goes to the weight of her testimony, a matter for the finder of facts."). In Abeita the Sixth Circuit reversed the district court's finding that the sexual harassment was not pervasive because "the District Court's analysis omit[ted] the plaintiff's claim that [her supervisor's] sexual comments were 'commonplace,' 'ongoing,' and 'continuing.'" Id. Unlike the facts of the present case, the person creating the hostile work environment for the plaintiff in Abieta was not only her supervisor but also a person who she interacted with on a daily basis. Here, Savage, Brewer, and Lea were not Plaintiff's supervisors and they did not regularly work at Earle C. In fact, Defendant identifies only eight specific instances in which Savage was even present at Earle C. (Def. Mem. in Supp. of its Mot. for Summ. J., DN 30-1, at 4-5).

---

[3] Those incidents include Savage's commenting on the picture of Plaintiff's family, Lea calling Plaintiff a "dog," Johnson making a comment about the "white women around here," and Lea rubbing Cole's arm and accusing him of having an affair.

12

Notwithstanding Plaintiff's argument that the harassment was continuous, the Court believes the facts of this case more closely resemble those found in Burnett. As previously discussed, Burnett involved three incidents of alleged harassment over the course of six months. Burnett, 203 F.3d at 985. In distinguishing the facts of Burnett from those of Abieta, the Sixth Circuit found it particularly significant that the plaintiff did not allege continuous or ongoing harassment, unlike the plaintiff in Abieta. Id. at 984. Because the plaintiff only alleged those three incidents, the court concluded that the environment was less pervasive than the one found in Abieta. Id. By the same token, even though the Plaintiff in this case alleges repetitive harassment, the facts of this case do not support the possibility of daily harassment by a supervisor as found in Abieta. As a result, this case is more in line with Burnett.

While there is no precise number of incidents before a work environment may be considered pervasively hostile, the Court does not believe the number of alleged instances described by Plaintiff rises to the level found in Williams. As such, the Court does not find an objectively pervasive hostile work environment, especially considering how brief each interaction appeared to be and the sporadic nature of those interactions.

Because the Court finds that the Plaintiff has failed to show that a hostile work environment existed under the fourth prong of a *prima facie* case, there is no reason to discuss employer liability. Defendant's motion for summary judgment on Plaintiff's hostile work environment claim based on race and sex is **GRANTED**.

### B. Retaliation

Plaintiff alleges that Defendant retaliated against him for making complaints of sexual and racial harassment. Based on Plaintiff's response to Defendant's summary judgment motion, he appears to allege that MTC engaged in two adverse employment actions against him.

Specifically, he argues that he was denied a merit increase by Johnson shortly after making a complaint about Savage, and he also contends that Defendant terminated him because of his complaints of harassment by Brewer, Lea, and Savage. Defendant responds by arguing that Plaintiff cannot establish a *prima facie* case for retaliation as no causal connection can be shown between his complaints and the adverse employment actions, but even if he could show a causal relationship, Cole fails to refute Defendant's legitimate, non-discriminatory reason for taking such actions.

### 1. *Prima Facie* Case

In order for Plaintiff to establish a *prima facie* case for retaliation, he faces the initial burden of showing that:

> (1) the plaintiff engaged in activity protected under Title VII; (2) plaintiff's exercise of her protected rights was known to defendant; (3) an adverse employment action was subsequently taken against the employee or the employee was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.

Fuhr v. Hazel Park School Dist., 710 F.3d 668, 674 (6th Cir. 2013) (citation omitted). It should be noted that "[t]he burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." Mickey v. Zeidler Tool and Die Co., 516 F.3d 516, 523 (6th Cir. 2008) (citation and internal quotation marks omitted). If the plaintiff establishes a *prima facie* case, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). If the employer carries that burden, "the burden of production returns to the plaintiff to demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for discrimination." Fuhr, 710 F.3d at 675 (citing Abbott v. Crown Motor Co., 348 F.3d 537, 542 (6th Cir. 2003)).

Defendant initially contests the second element of Plaintiff's *prima facie* case for retaliation because the ultimate decision-maker, John Pedersen, lacked knowledge of any of Plaintiff's complaints. Moreover, Defendant argues that neither Johnson nor Hall received any written complaints from the Plaintiff and that both denied any knowledge of the complaints. However, the testimony of Cooper and Hagedorn is to the contrary. They remember Cole making reports of harassment and Hagedorn believes she completed a form and reported it to upper management. Construing the facts in the light most favorable to the party opposing summary judgment, see, e.g., Wharton v. Gorman-Rupp Co., 309 Fed.Appx. 990, 995 (6th Cir. 2009), the Court finds that the Plaintiff's assertions of fact are sufficient to satisfy the second prong of the *prima facie* case.

The Defendant next argues that Plaintiff fails to establish a causal connection between his complaints and the subsequent adverse employment action because "Cole's discharge followed a separate, intervening event: MTC's investigation of Center records, practices, and interviews of staff and students, which uncovered extensive mismanagement of Earle C . . . ." (Def. Mem. in Supp. of its Mot. for Summ. J., DN 30-1, at 17). In response, Plaintiff relies on both the temporal proximity of his complaints and a statement from Brewer saying that he would lose his job if he kept making complaints. "Proof of temporal proximity between the protected activity and the adverse employment action, 'coupled with other indicia of retaliatory conduct,' may give rise to a finding of a causal connection." Dixon v. Gonzales, 481 F.3d 324, 333 (6th Cir. 2007) (quoting Randolph v. Ohio Dep't of Youth Servs., 453 F.3d 724, 737 (6th Cir. 2006)). Plaintiff describes a three-month timeframe between his complaints and Johnson's denial of his merit increase. Additionally, Plaintiff believes that about five months lapsed between his complaint to Hall and the investigation that led to his termination. For the issue of temporal proximity, both

parties identify cases that support their respective positions. Singfield v. Akron Metro. Hous. Auth., 389 F.3d 555, 563 (6th Cir. 2004) (holding three months between making a complaint and plaintiff's termination sufficient to establish a causal connection); Dollar Gen. Partners v. Upchurch, 214 S.W.3d 910, 915 (Ky. 2006) (finding five months sufficient). But see Hafford v. Seidner, 183 F.3d 506, 515 (6th Cir. 1999) (holding two to five months insufficient). However, Plaintiff has no other indicia of retaliatory conduct to support a causal link between his complaint and the denial of a merit-based salary increase. Even if the three-month gap sufficiently demonstrated a causal link, Plaintiff has failed to show that the Defendant's legitimate, non-discriminatory reason for not giving the merit increase is a pretext for retaliation. Johnson told Cooper that Cole started at a higher salary than MTC intended to originally pay him, and as such, she would not approve a merit increase. Plaintiff does not offer any pretextual argument to rebut Defendant's legitimate, non-discriminatory reason concerning the denial of the merit increase. As a result, the Court will not examine this theory of retaliation further. In contrast, the five-month proximity between Plaintiff's complaint and his termination along with the statement from Brewer provides enough facts to show a causal relationship for a *prima facie* case.

**2. Legitimate Reason and Pretext**

Once the Plaintiff has established a *prima facie* case, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. The Defendant has done so in this case. In addition to the Notice of Caution provided to Plaintiff, Defendant lists other reasons for Plaintiff's termination, including having others do his work for him, disappearing with subordinates for an extended period of time, failing to follow corporate policies. Therefore, under the burden-shifting framework, Plaintiff must demonstrate that

Defendant's reason for terminating him was pretextual. Harris v. Giant Eagle, Inc., 133 Fed.Appx. 288, 294 (6th Cir. 2005). The Sixth Circuit has described this process as follows:

> A plaintiff can refute the legitimate, nondiscriminatory reason articulated by an employer to justify an adverse employment action by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct. Regardless of which option is used, the plaintiff retains the ultimate burden of producing *sufficient evidence from which the jury could reasonably reject the defendants' explanation and infer that the defendants intentionally discriminated against him.*

Id. (quoting Johnson v. Kroger Co., 319 F.3d 858, 866 (6th Cir. 2003)).

Plaintiff first contends that Defendant's proffered reasons for terminating Plaintiff should be limited to the information provided in the Notice of Caution. Defendant responds by explaining that the Notice of Caution "only summarized some widespread mismanagement uncovered by the investigation into Earle C." (Def. Reply in Supp. of Mot. for Summ. J., DN 35, at 13). Although Plaintiff cites no authority to limit the inquiry in such a manner, the Court finds it unnecessary to consider the other reasons mentioned by Defendant because, in the Court's opinion, Plaintiff has failed to show that reasons contained in the Notice of Caution are pretextual.

Plaintiff attacks the Notice of Caution because "[t]he lion's share of the Notice of Caution is dedicated to listing of student disciplinary actions at the Earle C. Center with an allegation that the failure to separate those students from the Job Corps Program violated the Zero Tolerance ("ZT") policy of MTC." (Resp. to Def.'s Mot. for Summ. J., DN 33, at 24). While Plaintiff thoroughly analyzes why this particular reason lacks a factual basis, he fails to address any of the other reasons listed in the Notice of Caution. Moreover, "[w]hen an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken,

foolish, trivial, or baseless.'" Chen v. Dow Chem. Co., 580 F.3d 394, 401 (6th Cir. 2009) (citation omitted). There is no evidence to suggest that John Pedersen, the ultimate decision maker, had reason to doubt the facts alleged concerning Cole's failure to properly discipline students under the Zero Tolerance. In addition, Plaintiff offers no arguments concerning the tampering with certain forms and problems regarding interactions with staff.

Next, Plaintiff attempts to demonstrate that Defendant diverged from its normal disciplinary system, which he believes provides evidence of a pretextual motive. Plaintiff relies on Cooper who stated that he could not recall a time in which Earle C. terminated an individual after a first offense. "Evidence that the progressive-discipline policy asserted as a rationale for an employee's termination was not uniformly applied is evidence of pretext." Lamer v. Metaldyne Co. LLC, 240 Fed.Appx. 22, 33 (6th Cir. 2007) (citation omitted). However, Plaintiff has not provided any evidence that his termination did not conform to Defendant's progressive discipline policy. Cooper's knowledge about the lack of terminations for first offenses only goes to what happened at Earle C. with previous private contractors that operated the facility, not the practices of the Defendant. Instead, both Savage and Johnson testified that if infractions were severe enough, an employee could be terminated on a first offense. Plaintiff was not the only high ranking employee terminated after the lengthy investigation which revealed a multitude of institutional problems. The Plaintiff has not shown that his actions were not egregious enough to warrant termination.

Finally, Plaintiff contends that the composition of the investigatory team that recommended his termination suggests a pretextual motive. However, none of the three individuals he listed as harboring a retaliatory motive, participated in the ultimate decision to terminate him. The make-up of the investigatory team would be more problematic if Plaintiff

could show that their findings were incorrect. At most, all Plaintiff does is argue that he was not to blame for all the problems uncovered. The parties do not dispute that Pedersen made the ultimate decision to terminate the Plaintiff. "This circuit has held that a statement by an intermediate level management official is not indicative of discrimination when the ultimate decision to discharge is made by an upper level official." McDonald v. Union Camp Corp., 898 F.2d 1155, 1161 (6th Cir. 1990). Plaintiff fails to offer any evidence that Pedersen had any retaliatory motive when deciding to terminate him.

For the following reasons, Defendant's motion to summary judgment on Plaintiff's retaliation claim is **GRANTED**.

### C. Unlawful Termination

Plaintiff asserts that Defendant unlawfully terminated him in violation of Kentucky's common law exception to the "terminable-at-will" doctrine. Specifically, Plaintiff argues that Defendant terminated him for adhering to the zero tolerance drug policy pursuant to 29 U.S.C. § 2892 after being told to ignore the policy by Lonnie Hall and Derrick Dulfin. Defendant argues that even if Plaintiff's factual assertions are taken as true, he fails to establish the elements, as a matter of law, for a claim based on unlawful termination.

Kentucky law still maintains that an employee is "terminable-at-will," but it has adopted "'a narrow public policy exception . . .' when the firing of an employee undermine[s] a 'most important public policy.'" Hill v. Kentucky Lottery Corp., 327 S.W.3d 412, 420 (Ky. 2010) (quoting Firestone Textile Co. Div. v. Meadows, 666 S.W.2d 730, 734 (Ky. 1984)). In order to prove wrongful discharge, a plaintiff must show that his termination was the result of either (1) failing or refusing to violate the law, or (2) exercising "a right conferred by well-established legislative enactment." Grzyb v. Evans, 700 S.W.2d 399, 402 (Ky. 1985) (citation and internal

quotation marks omitted).  The tort of wrongful discharge is only applicable if (1) "[t]he discharge [is] contrary to a fundamental and well-defined public policy as evidenced by existing law," or (2) the policy is "evidenced by a constitutional or statutory provision." Hill, 327 S.W.3d at 421 (citation omitted).  "The decision of whether the public policy asserted meets these criteria is a question of law for the court to decide, not a question of fact." Id.

The Court finds that there is no need to explore the merits of Plaintiff's claim based on unlawful termination.  Plaintiff relies entirely on federal statutes to support his claim, specifically 29 U.S.C. § 2892.  Both federal and state courts in Kentucky have consistently held that the public policy exception *only* applies to the laws of Kentucky. Fleming v. Flaherty & Collins, Inc., 2013 WL 3357977, at *4 (6th Cir. July 3, 2013) (finding that refusing to break a federal law fails to support a claim for wrongful termination in Kentucky); Goins v. Interstate Blood Bank, Inc., 2005 WL 1653611, at *4 (W.D. Ky. July 12, 2005) ("[F]ederal regulations cannot form the basis of a wrongful discharge claim in violation of public policy in Kentucky."); Shrout v. The TFE Group, 161 S.W.3d 351, 355 (Ky. Ct. App. 2005) ("[T]he underpinning of a wrongful discharge, extends a right of action only for the violation of a Kentucky statute or a constitutional provision. The protection does not extend to the violation of a federal regulation.").  The Court finds no reason to depart from these prior determinations.

## IV. CONCLUSION

For the foregoing reasons, Defendant Management & Training Corporation's Motion for Summary Judgment [DN 30] is **GRANTED**.

cc: counsel of record

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

October 31, 2013